## STATE OF CONNECTICUT
vs.
## DAVID MAGLIORI

Superior Court     Hartford County     File #13649

Present: Hon. CARL FOSTER, Judge.

Hugh M. Alcorn,
    State's Attorney,        Attorney for the State.

Frank E. Healy,        Attorney for the Defendant.

MEMORANDUM FILED JULY 23, 1937.

FOSTER, J.   The accused is charged in three counts of violating the provisions of **General Statutes, Section 6333.** This statute is as follows:

"Any person who shall organize, manage or be concerned in any club or other association of persons for the sale, exchange or disposal of any property, in which such sale or exchange or disposal shall be dependent upon or connected with chance, by lot, dice, numbers or other gambling device, and whereby such chance shall be made in whole or in part an inducement to such sale, exchange or disposal of such property, or shall, by soliciting, writing or printing, aid or be concerned in obtaining subscriptions or contracts whereby any other person shall become concerned in such sale, exchange or disposal of any property, shall be fined not more than one thousand dollars or imprisoned not more than one year."

The State and the accused have presented no evidence but have filed with the Court an agreed Statement of Facts as follows:

"1.   The accused, David Magliori, is the manager of the Rialto Theatre, a motion picture theatre located in the Town of Windsor Locks, Connecticut.   Said theatre is patronized by children of both sexes, many of them under the age of sixteen.

2.   During the month of September 1935, the accused received a call from a representative of The New England Bank Night Company, having its principal place of business in the City of Boston, Commonwealth of Massachusetts.

3.   Said representative offered to the accused a plan having for its purpose the increase of attendance at said theatre, said plan having been alleged to have been copyrighted.

4.   Said accused thereafter entered into an agreement with said The New England Bank Night Company by which said theatre was to operate a plan known as "Bank Night" once each week, retaining the receipts therefrom and paying to said The New England Bank Night Company the sum of Ten (10) Dollars weekly for the privilege of using said plan.

5. Thereupon said accused as manager of said theatre proceeded to put said plan into operation, the purpose of which was to increase the paid attendance at said theatre and the profits to the management.

6. Said plan consisted in part of allowing the patrons of said theatre who had paid the admission fee of twenty-five (25) cents per person to register their names in a book provided and kept by the accused for that purpose in their own handwriting and of assigning a number to each name so registered. Said plan also consisted in part of having a registry book in the lobby of the theatre that was open to the public at all reasonable hours, and in order to register it was not necessary to purchase an admission ticket to the theatre for any performance. One registration was sufficient for all "Bank Nights" and entitled every registrant to participate in every subsequent drawing. There was no difference in the number or quality of the pictures shown on "Bank Night" than on other nights.

7. All numbers were placed in a revolving hopper on each "Bank Night" and three disinterested persons appointed by the management acted as judges of the contest, assisted by a young child from the audience who was blindfolded. This child was instructed to draw only one number from the hopper and hand same to the judges. This winning number was read by all three judges, and the number announced to the audience, both inside and outside the theatre, by means of a messenger and a loud speaker. The loud speaker was located on the exterior of the theatre, in front of the entrance.

8. Thereupon the number upon said coupon was compared with said registry and the name to which said number was assigned was called out by a contest judge chosen for that purpose. Said name was called both within and without the theatre.

9. If the person to whom such number was assigned was within the theatre the weekly prize of Twenty-five (25) Dollars or more as the case might be was paid to him or her upon appearance upon the stage and upon being properly identified.

10. During the drawing, the theatre ticket office was closed and immediately upon the announcement by the judges of the winner of the money, a messenger in the employ of the management announced the name of the winner in the street in

front of the theatre, and the person thus declared a winner could enter the theatre without buying a ticket and claim and secure said money, within a time limit of three minutes after his name was called. In addition to the messenger used in the original plan, a loud speaker was installed for the sole purpose of announcing the winning number and winning name to the public gathered in front of the theatre. In two instances, "Bank Night" awards were collected by non-attending theatre-goers, who were standing in the street when their names were called as winners.

11. In the event the person whose name was called was not within the theatre or did not claim said money within the three minutes limited as aforesaid, the drawing was declared closed and no money was awarded. The amount of said money was then added to the following week's drawing. All money not so claimed was added to the drawing of the following week so that in some instances the amount given in cash was large. In this case the money amounted to Five Hundred Twenty-five (525) dollars, and the winner, who was not present at the drawing, received a check for that amount from the accused on the second day following said drawing. Said winner had attended a matinee performance in said theatre on the day of the drawing.

12. The operation of said plan materially increased the paid attendance at said theatre and shortly after entering into said agreement, the accused entered into a second agreement by which a drawing, or "Bank Night" was conducted twice each week in the same manner as hereinbefore set forth. The accused as manager of said theatre paid the said The New England Bank Night Company the sum of Seventeen and 50/100 (17.50) Dollars weekly for the privilege of conducting said "Bank Night" twice each week.

13. During the first two months of the operation of said plan as aforesaid, the accused as manager of said theatre arbitrarily added names taken from the telephone directories of other towns in Connecticut and Massachusetts to said registry list and a number was assigned to each name. The persons whose names were added to said registry list were not patrons of said theatre but were notified by postal card of the addition of their names to said registry list.

14. In addition to the regular names in said registry list, a further change was made in the original plan by allowing

persons who had attended the matinee performance in the theatre on the day of the "Bank Night" drawing to register their names in a special file.

15. In the event a number assigned to a person whose name appeared in said special file was drawn as aforesaid, said money was awarded to such person even though he was not within the theatre or did not claim said money within said time limit of three minutes.

16. The purpose of the special file was to increase the number of paid admissions to said theatre, and the number of tickets sold was thereby materially increased.

17. In several instances, without the knowledge of the management, persons whose names were registered in the "Bank Night" registry purchased tickets on the day of a drawing, registered their names in said special file but did not attend the showing of motion pictures within said theatre; and by the payment of the regular admission fee it was possible for them to receive the award if their number was drawn even though they were not present or did not claim it within three minutes after their names were drawn and called.

18. In some instances, without the knowledge of the management, persons paid the price of admission solely for the purpose of participating in said drawing, thereby entitling them to a chance to receive said award without being present at the drawing of the numbers as aforesaid.

19. Although the names of minors appeared on said registry list the accused had previously refused to pay an award (which through accumulations as aforesaid then amounted to Four Hundred Fifty (450) Dollars) to the winner thereof on the ground that he was a minor under the age of sixteen and therefore such payment was forbidden by the laws of the State of Connecticut. Said minor, however, had paid the admission fee of twenty-five (25) cents to said theatre which entitled him to a chance in said drawing in the manner above set forth. "Bank Night" registration books, being in the lobby of the theatre, minors had an opportunity to place their names in the same without the knowledge of the theatre management. There were two printed cards, one over the registry book and one over the clock to the left of said book, with printed instructions that no minor was allowed to register and no children under sixteen were allowed to participate in the drawings. Similar announcement was also shown on the

theatre screen and was also made by the judges. If any children did register, they did so contrary to the rules of the theatre, and of the "Bank Night" plan.

20. All equipment used in said drawings was seized by the police and has been held by them since the arrest of the accused which took place on January 23, 1937.

21. The numbers assigned to the names in said registry book were permanent and non-assignable.

22. Said "Bank Night" was extensively advertised by the accused as manager of said theatre."

The Court must determine whether the acts of the accused as set forth in the agreed Statement of Facts constitute a violation of the statute.

In each count it is charged that the accused did set up a certain "lottery or scheme of chance by numbers, etc." Both the State's Attorney and counsel for the accused argue at some length as to the definition of the word "lottery", and whether or not the acts of the accused constituted the conduct of a "lottery". The use of the word "lottery" in the information is unfortunate and unnecessary. The real question is not whether the accused conducted a "lottery"; it is whether the accused violated the terms of the statute. The word "lottery" does not appear in the statute.

Turning to the words of the statute and examining the agreed Statement of Facts, it cannot be reasonably disputed that the accused managed and was concerned in an association of persons for the exchange and disposal of property (to wit: money) in which such exchange and disposal was dependent upon and connected with chance by numbers, and whereby such chance was in whole or in part an inducement to such exchange and disposal of such property.

The accused claims that the transaction was an advertising scheme. If so, it is not thereby permissible under the law.

We are not here concerned with the question of whether or not the plan was a gambling device, or whether it was moral per se, or whether or not there was any unfairness in the matter. The sole question is whether the acts of the accused constituted a violation of the statute.

Stripped of all legal verbiage the accused is charged with violation of this statute law.

The Court finds the accused guilty upon each of the three counts.

It does not appear that any person or persons is or have been injured by the violation of the statute by the accused. It is represented to the Court that the courts of this state have not heretofore been called upon to decide whether acts such as here admitted constitute a violation of the statute; it appears that this is what is sometimes termed a test case.

With these facts in mind the sentence of the Court is that the accused pay a fine of Ten ($10) Dollars upon the first count; a fine of One ($1.) Dollar upon the second count; and a fine of One ($1.) Dollar upon the third count.